# EXHIBIT A

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type:  Other Civil (14)

Court File No. _____

Ryan Fund IX, LLC; and
Ryan Companies US, Inc.

Plaintiffs,

vs.

Equity Global Management, LLC;
Solvenz, LLC; and Tethys Partners,
LLC,

Defendants.

**SUMMONS**

THIS SUMMONS IS DIRECTED TO **TETHYS PARTNERS, LLC,** by Jack Meyer, 2510 Via Torina, Del Mar, CA  92014.

1.      YOU ARE BEING SUED.  The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons.  Do not throw these papers away.  They are official papers that affect your rights.  You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

2.      YOU MUST REPLY (WITHIN 30 DAYS OF MAILING BY THE MINNESOTA SECRETARY OF STATE PURSUANT TO MINN. STAT. § 5.25 SUBD. 7) TO PROTECT YOUR RIGHTS.  You must give or mail to the person who signed this summons **a written response** called an Answer within 30 days of the date on which you were mailed this Summons by the Minnesota Secretary of State.  You must send a copy of your Answer to the person who signed this summons located at:

Corey J. Ayling
McGrann Shea Carnival Straughn & Lamb, Chartered
2600 U.S. Bancorp Center
800 Nicollet Mall
Minneapolis, MN  55402

3.    YOU MUST RESPOND TO EACH CLAIM.    The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4.    YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS. If you do not Answer within 30 days of mailing by the Minnesota Secretary of State, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in this complaint.

5.    LEGAL ASSISTANCE.  You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6.    ALTERNATIVE DISPUTE RESOLUTION.   The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: March 13, 2014.

McGRANN SHEA CARNIVAL
STRAUGHN & LAMB, CHARTERED

By_____
Corey J. Ayling,
Att'y Reg. No. 157466
2600 U. S. Bancorp Center
800 Nicollet Mall
Minneapolis, MN 55402
Telephone: (612) 338-2525

*Attorneys for Plaintiffs Ryan Fund IX, LLC and Ryan Companies US, Inc.*

2

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

Case Type: Other Civil (14)

Court File No. _____

Ryan Fund IX, LLC; and
Ryan Companies US, Inc.

      Plaintiffs,

**COMPLAINT**

  vs.

Equity Global Management, LLC;
Solvenz, LLC; and Tethys Partners,
LLC,

      Defendants.

## NATURE OF THE ACTION

1. Plaintiffs (collectively, "Ryan") were solicited by Defendants to enter into negotiations to sell and obtain financing for the construction of commercial office properties and to advance $175,000 for application to costs, expenses, and fees with respect to definitive agreements to be negotiated, executed, and closed. Defendants' solicitation was extremely aggressive and represented better terms than any other bidder for Ryan's properties. After Defendants did nothing to bring the transaction to fruition, Ryan cancelled the negotiations and demanded the return of its funds tendered in good faith. Defendants then refused to return the funds, changed the originally contemplated terms of the deal in their favor, and demanded that Ryan enter into a new deal on terms less favorable to Ryan.

2. Defendants, in short, made an offer that they knew or should have known

they could not honor, induced with that offer the payment of $175,000, and then failed to negotiate in good faith.

3.    Ryan is entitled to the return of $175,000 in funds that represent the fruits of fraud, unjust enrichment, and conversion.

4.    Alternatively, to the extent the Court finds that the letter of intent signed by the parties is, contrary to its plain terms, a contract, then it should find that the contract is void for failure of a condition in the form of definitive sales and loan agreements executed before Ryan's right of timely termination ripened after September 30, 2013.  The Court should declare that Defendants enjoy no right to retain funds previously paid under the void contract.

## JURISDICTION AND VENUE

5.    This Court enjoys subject matter jurisdiction over the claims asserted herein by reason of Minn. Stat. § 484.01

6.    This Court enjoys personal jurisdiction over Defendants by virtue of the following:

a.    The Defendants directed electronic and telephonic solicitations to Ryan in Minnesota to enter into a transaction that would be performed in part in Minnesota and that would result in the sale and financing of commercial office properties in the Des Moines, Iowa metropolitan area;

b.    Defendants' solicitations of Ryan in Minnesota were for the purpose of inducing Ryan to pay $175,000 to Defendant from Ryan's Minnesota account;

c.    Defendants purposefully directed their activities to citizens of Minnesota by soliciting and inducing Ryan US to transmit $175,000 from its

2

Minnesota account; seeking loan performance, including the recourse guarantee thereof, from Ryan US, a Minnesota corporation located in Minnesota; soliciting the production of confidential Minnesota business information; and seeking to enter into sale and loan negotiations that were terminated by Ryan after less than 3 months. After negotiations were terminated, Defendants then embarked on a two month campaign to attempt to solicit Ryan (through communications directed to Minnesota) into entering into a deal recast in Defendants' favor.

d.    The claims herein arise from the above-listed contacts and constitute grounds for finding specific personal jurisdiction.

e.    Defendant Equity Global Management, LLC ("EGM") is an investment firm with its principal place of business in Chicago, Illinois (and organized as a limited liability company) that seeks opportunities in the commercial net lease real estate markets nationwide; that has invested in or financed more than $2.0 billion of net lease properties (including sale-leaseback transactions) and who has, on information and belief, solicited business in or invested in or financed properties in Minnesota. The Court therefore enjoys general personal jurisdiction over EGM.

f.    Defendant Solvenz LLC ("Solvenz") is a financier organized under the laws of New York which solicits and transacts business throughout the United States, including, on information and belief, within Minnesota. The Court therefore enjoys general personal jurisdiction over Solvenz.

g.    Defendant Tethys Partners, LLC ("Tethys") is a limited liability organized under the laws of Delaware; on information and belief its principal place of business is in Chicago, Illinois. With respect to the transaction at issue, Tethys'

3

representative agent was Jack Meyer, who has officed in Austin, Texas and in Del Mar, California. Tethys solicits and transacts a variety of investment businesses throughout the United States, including, on information and belief, within Minnesota. The Court therefore enjoys general personal jurisdiction over Tethys.

7.    Pursuant to Minn. Stat. § 542.09, this action is properly venued in Hennepin County inasmuch as Defendants transacted business in that county via contacts, solicitations, and solicitation of payment directed to Ryan in Minneapolis, Minnesota, and given that this claim arises from same.

## PARTIES

8.    Plaintiff Ryan Fund IX, LLC ("Ryan Fund") is a limited liability company organized under the laws of Delaware and has its principal place of business at its headquarters in Minneapolis, Minnesota. Ryan Fund is the owner of the Phase I property referenced in the letter of intent (located in the Des Moines, Iowa metropolitan area) that was the subject of Defendants' solicitation to purchase.

9.    Plaintiff Ryan Companies US, Inc. ("Ryan US") is a corporation organized under the laws of Minnesota and has its principal place of business at its headquarters in Minneapolis, Minnesota.    Ryan US has for the past 75 years served as a general contractor, developer, and manager of properties in Minnesota as well as in other areas of the country. Defendants solicited Ryan US to provide it with financing for its role as general contractor, developer, and owner of the Phase II property referenced in the letter of intent. Ryan US paid the $175,000 of funds at issue in this litigation.

10.    Defendant Equity Global Management, LLC ("EGM") is an investment firm with its principal place of business in Chicago, Illinois (and organized as a limited liability

4

company under the laws of the State of Delaware; its registered agent for service of process is Corporation Service Company, 2711 Centerville Road, Suite 40, Wilmington, Delaware 19808). EGM seeks opportunities in the commercial net lease real estate markets nationwide; it has invested in or financed more than $2.0 billion of net lease properties (including sale-leaseback transactions); and it has, on information and belief, solicited or invested in or financed properties in Minnesota.

11.     Defendant Solvenz LLC ("Solvenz") is a limited liability company organized under the laws of New York and whose registered agent is located in Chicago, Illinois. Solvenz is affiliated with a financier using the "Solvenz" name who is based in Luxembourg City, Luxembourg. Solvenz solicits and transacts business throughout the United States, including, on information and belief, within Minnesota.

12.     Defendant Tethys Partners, LLC ("Tethys") is a limited liability organized under the laws of Delaware with its principal place of business in, on information and belief, Chicago, Illinois. Tethys' registered agent for service of process is National Corporate Research, Ltd., 615 Dupont Highway, Dover, Delaware 19901. Tethys solicits and transacts a variety of investment businesses throughout the United States, including, on information and belief, within Minnesota.

## THE SUBJECT PROPERTY

13.     Ryan Fund owns Phase I and Ryan U.S. owns Phase II of the corporate office campus in suburban Des Moines, Iowa that is leased to serve as the corporate headquarters of Pioneer Hi-Bred International (the "Subject Property").

14.     The Subject Property consists of two buildings: Phase I, comprised of 198,544 square feet, which was built in 2012 (and owned by Ryan Fund), and Phase II, a

5

second building (owned by Ryan US) to be constructed and, when completed by Ryan US, to be comprised of 184,232 square feet. The Subject Property is leased through January 2, 2027.

## DEFENDANTS' SOLICITATION OF RYAN

15. Ryan disseminated an inquiry into the market for prospective purchasers of the Subject Property.

16. EGM responded to Ryan's inquiry by aggressively and repeatedly soliciting the acquisition of Phase I and the financing and acquisition of Phase II. EGM assembled a consortium that included Solvenz and Tethys as construction lender.

17. The terms offered by EGM, Solvenz, and Tethys were better than that offered by any other purchaser – particularly with respect to the loan for Phase II with a high loan-to-value ratio that required little equity. The purchase price for Phase I was $45.4 million; the purchase price for Phase II was $37 million. The construction loan for Phase II would require interest-only payments at a rate of 4.86% per annum and had a loan-to-value ratio of 90%.

## THE LETTER OF INTENT

18. On August 20, 2013, Ryan US, on behalf of itself and Ryan Fund, executed a letter of intent prepared and solicited by EGM, whose CEO, Shelby Pruitt, also signed the document ("LOI"). A true and correct copy of the LOI is attached as Exhibit A.

19. The opening clause of the LOI stated: "This letter of intent sets forth proposed terms, for discussion only...." The last sentence of the first paragraph advised: "This letter is an expression of basic terms only and not a legally binding agreement."

6

20. The LOI outlined the terms of the purchase price for Phase I and Phase II and noted the intent for Ryan US to serve as general contractor to complete Phase II. The LOI outlined the terms of the construction loan.

21. The LOI referenced "Definitive Agreements", to be negotiated and executed. Several purchaser contingencies were listed as contemplated for the Definitive Agreements.

22. The LOI contemplated closing "within 30 days after execution of the Definitive Agreements (anticipated to be not later than October 31, 2013) or such other date as is mutually agreeable to the parties."

23. In an August 20, 2013 email from Dan Levitt of Ryan to Shelby Pruett of EGM confirming previous email and telephonic communications between the two, Levitt noted "it is mutually agreed that all parties will work diligently to close the transactions no later than October 30, 2013, which date is subject to extension for unforeseen circumstances only."

24. Under a section entitled "Documentation", the LOI stated the intent for Ryan U.S. to pay certain costs and to be reimbursed for those costs upon closing.

> Seller shall pay all legal fees and related costs and expenses of the Lender relating to the Construction Loan for the Phase II property as incurred up to $175,000. Upon Closing, the Seller shall be reimbursed for the amount of such expenditures incurred up to $175,000.

25. The LOI then stated that Ryan US would wire $175,000 to Solvenz by August 2, 2013. The LOI would be "null and void" absent such wiring. The other immediate value provided by Ryan was a covenant of exclusivity:

> Exclusivity:

> Seller shall not initiate or conduct negotiations for the sale of the Property or provisions of a Construction Loan with any party other than Purchaser and

Lender unless Purchaser and Seller do not execute a Definitive Agreement on or before September 30, 2013, in which event either party may terminate negotiations upon notice to the other.

In email correspondence from Shelby Pruett of EGM to Dan Levitt of Ryan on August 19, 2013, Pruett confirmed that Ryan had originally sought September 15th as the end date for exclusivity and that September 30 was a compromise date and that "The exclusivity now ends if definitive documents are not entered into by an outside date of Sept 30th."

26.    The LOI concluded by reiterating the intent not to create a binding agreement:

> This letter of intent does not, and is not intended to, be legally binding on the parties (except for the provision entitled "Exclusivity" above). This letter of intent is only an expression of the basic conditions to be incorporated into the Definitive Agreement together with other terms to be agreed to between the parties. The parties shall not be contractually bound unless and until they enter into a Definitive Agreement, which must be in a form and content satisfactory to each party and to each party's legal counsel, in their sole discretion.

27.    In a letter dated August 21, 2013 electronically transmitted by Ryan to EGM, Ryan confirmed that the $175,000 transfer to the lender was "to pay for services strictly in accordance with the budget enclosed herewith." Ryan noted its intent to EGM that "[u]pon receipt of the LOI and the Transfer [of $175,000], Lender shall cause counsel to generate transaction documents in compliance with the terms of the LOI. Any amount on the Transfer not applied in accordance with the Budget shall be returned to Ryan upon the closing contemplated by the above-referenced LOI, or the mutual termination of negotiations by the parties thereto."

28.    $125,000 of the budget was for Solvenz's "Underwriting, Structuring, Actuarial — Debt Facility — Hybrid Acquisition / Construction Loan Structure (Oct 30 Timeline)." No

8

loan was underwritten or structured or proposed by the October 30th deadline, time being of the essence. Nor was same done as of the November 12, 2013 date of Ryan's termination of negotiations. $25,000 of the budget was for Stern Brothers' "Note Structure / Placement." No note was drafted, structured, or placed. $25,000 was for Frost Brown Todd, LLP for "Note, Disclosure and documentation." Other than some boilerplate documents lacking specific relevance to the contemplated transaction, no drafts of Definitive Agreements or other documents were tendered to Ryan by the October 30th deadline or as of the November 12th termination of negotiations.

## THE COMFORT LETTER

29.    Ryan required assurances from Solvenz and Tethys before wiring the $175,000 of funds referenced in the LOI. Solvenz and Tethys proceeded to induce Ryan US to wire the $175,000 of funds referenced in the LOI by sending a letter to Ryan US in Minneapolis, a true and correct copy of which is attached as Exhibit B (the "Comfort Letter").

30.    The Comfort Letter identified Solvenz and Tethys as the prospective lender referenced in the LOI. Solvenz and Tethys represented that they "will work in good faith to negotiate such Definitive Agreements (as defined in the Letter of Intent) as are reasonably required to document and secure the construction loan together with the purchase of existing property ...."

31.    Solvenz and Tethys represented that they were "familiar with the contents" of the LOI.

32.    Solvenz and Tethys further disclaimed any binding legal obligations with respect to the underlying transactions, pursuant to which the $175,000 could be spent:

9

"Nothing in this letter obligates Lender to fund any loan until full execution of the Definitive Agreements, which must be satisfactory to Lender, in Lender's sole discretion."

33.     In reliance on Solvenz's and Tethys' representations that they were familiar with the LOI and its lack of enforceability; that there was no deal until Definitive Agreements were executed"; and that Solvenz and Tethys would negotiate in good faith, Ryan US wired $175,000 in funds to Solvenz.

## RYAN'S TERMINATION OF NEGOTIATIONS

34.     Ryan discharged its duty of exclusivity.

35.     Ryan provided timely access to any information requested by Defendants to investigate the transaction. This included disclosures of Minnesota financial information made pursuant to a confidentiality agreement executed by EGM on August 15, 2013 and performed in part in Minnesota by Ryan US. A true and correct copy of that Agreement is attached as Exhibit C.

36.     Defendants did not negotiate in good faith. Defendants did nothing to materially advance the transaction. It became apparent to Defendants by mid-October 2013 that they could not structure the transaction as originally contemplated. In particular, Defendants knew or should have known that the high loan-to-value they offered could not be delivered. Defendants relied on the availability of residual value insurance to finance the loan – a device not reasonably available for this type of transaction. Defendants knew or should have known that residual value insurance would not be available. No Definitive Agreements were drafted or discussed. Instead, of frankly acknowledging their error and ending the negotiations, Defendants claimed that they would be able to explore and deliver a new method of providing the financing they had promised in August.

37. Ryan was materially prejudiced by this delay given its inability to market the Subject Property during the exclusivity period.

38. Defendants made no serious proposal between mid October and mid November 2013 that conformed to the terms outlined in the LOI. On or about November 12, 2013, Ryan, accordingly, served written notice of its termination of negotiations and requested return of the previously wired $175,000. A true and correct copy is attached as Exhibit D.

39. Neither EGM, Solvenz, nor Tethys objected to the termination notice. Neither EGM, Solvenz, nor Tethys objected to return of the $175,000 as demanded in the termination notice. Nor did any Defendant provide an accounting as to how any funds had been spent in conformance with the budget.

## DEFENDANTS' BAIT-AND-SWITCH

40. In a December 20, 2013 letter, EGM denied that it had responsibility for returning the $175,000, but agreed and admitted that the $175,000 was owed to and should be returned to Ryan. Indeed, EGM admitted that it had "repeatedly requested that Solvenz return all or part of the deposit to Ryan." A true and correct copy of EGM's December 20th letter is attached as Exhibit E.

41. Solvenz and Tethys, however, proceeded to prepare and deliver — more than one month after termination of negotiations — summary term sheets (but no drafts of Definitive Agreements) of a new proposed transaction restructured in the lender's favor. The new transaction involved only a loan and did not provide for purchase of Ryan Fund's Phase I and take-out purchasing of Ryan US's Phase II. Solvenz and Tethys indicated that if Ryan entered into this new transaction, then it could be reimbursed for its $175,000

11

once the transaction closed.

42. Defendants had previously induced Ryan to wire $175,000 pursuant to a promised transaction that proved to be impossible to deliver and that Defendants knew or should have known could not be performed. Such bad intent can be inferred from the materially different terms that emerged after cancellation of negotiations and from the complete failure to take steps to draft and negotiate the transaction by the October 30th deadline expressed by Ryan, time being of the essence.

43. Defendants have made no accounting as to the expenditure of the $175,000 funds in a timely fashion and pursuant to the budget outlined in August 2013.

## COUNT ONE
### (Fraud and Misrepresentation)

44. Ryan re-alleges paragraphs 1 through 43 above.

45. Defendants fraudulently induced Ryan to take the Subject Property off the market for the exclusivity period and to wire $175,000 to Solvenz by promising, with no present intention of performing, to negotiate and prepare in good faith Definitive Agreements reasonably consistent with the terms outlined in the LOI. Alternatively, Defendants induced same by negligently misrepresenting its ability to provide the financing terms represented in the LOI. Defendants obtained Ryan's detrimental reliance and wire of funds on the basis of false pretenses or negligent misrepresentation. After negotiations were cancelled, Defendants offered a materially different transaction much more favorable to Defendants.

46. Defendants fraudulently induced Ryan to wire $175,000 to Solvenz by promising, with no present intention of performing, to expend any of same only consistent

12

From: Richard McCrea <rmccrea@solvenz.com>
To: Robert N. Wilkinson <rnwlaw@aol.com>; jwilkinson <jwilkinson@andersoncall.com>; jasonewilk <jasonewilk@gmail.com>
Subject: Fwd: Ryan lawsuit part two...
Date: Thu, Mar 20, 2014 6:19 pm
Attachments: Scan_117.pdf (18730K)

Begin forwarded message:

From: Jack Meyer <jack@meyerholdings.net>
Date: March 20, 2014 at 4:36:55 PM MDT
To: Richard McCrea <rmccrea@solvenz.com>
Subject: Ryan lawsuit part two...

J.E. (Jack) Meyer, Jr.
Meyer Holdings, LLC
2510 Via Torina
Del Mar, CA 92014
Direct 918.740.8331
jack@meyerholdings.net

with the budget and October 30th deadline for Definitive Agreements stated in Ryan's correspondence contemporaneous with the transfer.

47. Defendants fraudulently induced Ryan to wire $175,000 to Solvenz by falsely representing that the LOI would be wholly unenforceable and nonbinding (except for Ryan's exclusivity promise) unless and until Definitive Agreements were negotiated and executed. Defendants made such representations with intent to convert the $175,000 to its own account regardless of the progress of the transaction, as evidenced by its failure to prosecute the transaction, deliver draft documents, adhere to the timing and substance of the budget, and as evidenced by its failure even to respond to Ryan's demand for return of funds until more than one month later when it recast the deal in the lender's favor.

48. Ryan reasonably relied on Defendant's negligent misrepresentations, false promises, and nondisclosures by proceeding with the LOI, by wiring $175,000, by making disclosures of documents, and by adhering to the exclusivity provision.

49. Defendants acted in the course of their business in engaging in this fraud and misrepresentation.

50. Defendants at best did not exercise reasonable care in their conduct and nondisclosure and, alternatively, acted with specific intent to deceive.

51. Defendants acted with deliberate disregard for the rights and interests of Ryan, or, alternatively, had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Ryan, but deliberately proceeded to act with either conscious/intentional disregard of the high degree of probability of injury to Ryan's rights or with indifference for same.

52. Ryan is entitled to damages proximately caused by Defendants' fraud.

13

Alternatively, given Defendants' deceit, Defendants are responsible for those results which must be presumed to have been within their contemplation at the time of the commission of the fraud, and Ryan may recover for any injury which is the direct and natural consequence of its acting on the faith of the Defendants' representations. Under the rule of *Lewis v. Citizen's Agency of Madelia, Inc.,* 235 N.W.2d 831 (Minn. 1975); *Autrey v. Trkla,* 350 N.W.2d 409, 412 (Minn. App. 1984); and *Whitney v. Buttrick,* 376 N.W.2d 274, 280 (Minn. App. 1986), Ryan would be left uncompensated for damages caused by Defendants' fraud under the out-of-pocket rule.

53.    This fraud proximately resulted in resulting in damages to Ryan (as well as unjust enrichment to Defendants) in an amount in excess of $50,000. Ryan is entitled to an award as against all Defendants, jointly and severally.

## COUNT TWO
### (Conversion)

54.    Ryan re-alleges paragraphs 1 through 53.

55.    Ryan wired $175,000 of funds to Solvenz at the instance of Defendants. Such funds were held in trust and were dedicated to the uses permitted by the LOI and by the correspondence and budget exchanged by the parties.

56.    Defendants obtained wrongful possession of such funds and diverted same to their own account and benefit.

57.    Defendants have wrongfully refused to account for and to deliver to Ryan the funds so obtained.

58.    Ryan is entitled to damages proximately caused by Defendants' conversion, including, but not limited to, restitution of ill-gotten gains in excess of $50,000 and the

imposition of a constructive trust on cash, personal property, real property, and any other value traceable to the funds taken by virtue of Defendants' conversion.

## COUNT THREE
### (Unjust Enrichment)

59. Ryan re-alleges paragraphs 1 through 58 above.

60. Ryan has conferred a benefit on Defendants in the form of a wire transfer of $175,000.

61. Defendants accepted and retained such benefit under circumstances that would render inequitable Defendants' continued retention of same without paying its value.

62. Ryan is entitled to an equitable remedy to prevent such unjust enrichment, including payment of the value of the benefit conferred.

## COUNT FOUR
### (Declaratory and Supplemental Relief re Voiding Of Contract for Failure of Condition)

63. Ryan re-alleges paragraphs 1 through 62.

64. To the extent the LOI created an enforceable contract, Defendants' right to retain the $175,000 in funds was contingent on the condition that Definitive Agreements conforming to the LOI be negotiated, drafted, and ultimately executed.

65. Because this condition was not fulfilled, Defendants have no contractual right to continue to retain the $175,000 or apply it to alleged but non-existent costs.

66. Ryan is entitled to judgment under Minnesota's Uniform Declaratory Judgments Act, Minn. Stat. § 555 construing the LOI, declaring that Ryan's performance thereunder is discharged for failure of a condition, declaring that Defendants have no right

15

to retain the $175,000 wire transfer of funds, and to supplemental relief in the form an award of damages to Ryan in excess of $50,000.

## COUNT FIVE
### (Breach of Contract)

67. Ryan re-alleges paragraphs 1 through 66.

68. To the extent the LOI or other documents created an enforceable contract to wire transfer $175,000, Defendants materially breached such contract by failing to negotiate in good faith, by failing to negotiate and deliver Definitive Agreements that conformed to the terms of the LOI and that were timely given that time was of the essence, and by failing to apply any such funds to an agreed upon budget.

69. Ryan is entitled to damages caused by Defendants' breach of contract in an amount in excess of $50,000.

## COUNT SIX
### (Breach of Fiduciary Duty)

70. Ryan re-alleges paragraphs 1 through 69.

71. By virtue of their obligations to dedicate, administer, prudently spend, and account for funds dedicated for the benefit of the Subject Property and the transaction contemplated by the LOI, Defendants assumed fiduciary duties to Ryan.

72. Defendants breached their fiduciary duty by diverting funds that should have been dedicated to negotiating and preparing timely Definitive Agreements conforming to the terms of the LOI and by failing to expend and to account for funds pursuant to an agreed-upon budget.

73. Defendants acted with deliberate disregard for the rights and interests of

Ryan and breached their fiduciary duties with respect to the handling, diversion, and conversion of funds.

74.    Ryan is entitled to damages proximately caused by Defendants' breach of fiduciary duty, including, but not limited to, restitution of ill-gotten gains in excess of $50,000 and the imposition of a constructive trust on cash, personal property, real property, and any other value traceable to the funds taken by Defendants.

## COUNT SEVEN
### (Equitable Accounting)

75.    Ryan re-alleges paragraphs 1 through 74.

76.    Ryan is entitled to an equitable accounting from Defendants as to the disposition of the wire-transferred funds; and to such other and further equitable relief as is just and appropriate.

17

## PRAYER FOR RELIEF

**WHEREFORE**, Ryan prays for judgment against Defendants, jointly and severally, for damages in excess of $50,000 for fraud and conversion; for declaratory relief confirming Ryan's right to return of funds as well as supplemental relief for money damages; to money damages in excess of $50,000 for breach of fiduciary duty and breach of contract; for an equitable accounting; and for such other and further relief as justice or equity may require.

Dated:  February 25, 2014

McGRANN SHEA CARNIVAL
STRAUGHN & LAMB, CHARTERED

By _____
Corey J. Ayling
Att'y Reg. No. 157466
2600 U. S. Bancorp Center
800 Nicollet Mall
Minneapolis, MN 55402
Telephone:  (612) 338-2525

*Attorneys for Plaintiffs Ryan Fund IX, LLC and Ryan Companies US, Inc.*

18

## ACKNOWLEDGMENT

On behalf of Plaintiffs, it is hereby acknowledged that, pursuant to Minn. Stat. § 549.211, sanctions (including monetary sanctions in the amount of the costs, disbursements and reasonable attorney's and witness fees caused by the violation) may be awarded to the opposing party or to the Court if the Court were to find that Plaintiffs or their attorney violated the following certifications made by operation of law when signing and serving papers in this litigation:

The papers are not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

The claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

The allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

The denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Corey J. Ayling

19

# EXHIBIT A



200 West Madison Street, Suite 3250
Chicago, Illinois 60606
312-827-2270  fax: 312-827-2281

August 20, 2013

VIA EMAIL

Daniel R. Levitt
Ryan Companies US
50 South Tenth Street, Suite 300
Minneapolis, MN 55403-2012

Re:    Pioneer Hi-Bred International – Beaver Creek Campus

Dear Dan,

This letter of intent sets forth proposed terms, for discussion only, for the acquisition of the approximate 382,776 square foot Pioneer Hi-Bred International – Beaver Creek Campus, and their attendant leases, located adjacent to the Pioneer Corporate Headquarters in suburban Des Moines, Iowa (the "Properties"). The Properties consist of two buildings: Phase I, comprised of 198,544 square feet, which was built in 2012, and Phase II, which will be comprised of approximately 184,232 square feet (adjoined to Phase I) currently being developed with construction beginning this month and an anticipated completion date of [November 2014]. The material terms of the transaction are summarized below. Following the execution of this letter, we will incorporate these terms into one or more legally binding agreements, including purchase and sale agreements with respect to the Phase I and Phase II properties and a Phase II Construction Loan agreement (collectively, the "Definitive Agreements"). Until the Definitive Agreements are executed by both parties hereto, there is no agreement to sell the Properties or to provide the construction loan. This letter is an expression of basic terms only and not a legally binding agreement.

Seller:            Ryan Fund IX, LLC, as to Phase I, Ryan Companies US, Inc., as to Phase II

Developer:          Ryan Companies US, Inc.

Purchaser:          Equity Global Management, LLC ("EGM") or its designated affiliate or assignee

*EGM is a principal-oriented investment firm based in Chicago, Illinois that seeks opportunities in the commercial net lease real estate markets. EGM's senior management team, through prior funds and affiliates, has invested in, or financed, more than $2.0 billion of net lease properties EGM specifically focuses on build-to-suit and sale-leaseback transactions. EGM, its affiliates or Principals have transacted with corporations such as AT&T, T-Mobile, Coca-Cola, Walgreens, Fiserv, Federal Express, and DuPont.*

Property Description:

Phase I
Tenant:                          DuPont/Pioneer Hi-Bred International Inc.
Remaining Lease Term:            Estimated 13.2 years
Size (Gross Building Area):      198,544 SF
Lease Commencement:              January 3, 2012
Expiration:                      January 2, 2027
Lease Type:                      Standard Real Estate Net Lease
Initial Base Rent:               $ 2,994,827 (see "Schedule A - Rent Schedule")

Phase II
Tenant:                          DuPont/Pioneer Hi-Bred International Inc.
Lease Term:                      Estimated 12.2 years
Size (Gross Building Area):      184,232 SF
Lease Commencement:              November 1, 2014
Expiration:                      January 2, 2027
Lease Type:                      Standard Real Estate Net Lease
Initial Base Rent:               $ 2,455,000 (see "Schedule A - Rent Schedule", which
schedule is subject to final reconciliation in accordance with the Lease)

Property Acquisition:

Earnest Money /
Construction
Deposit:                 The otherwise required earnest money deposit from the Purchaser for the benefit of the Seller shall be waived in consideration of the waiver of the otherwise required Construction Loan deposit from the Seller for the benefit of the Purchaser.

Purchase Price:          Phase I Property - $45,400,000 (6.6% cap rate on the Initial Base Rent).
                         Phase II Property - $37,000,000 (6.6% cap rate on the Initial Base Rent).

Purchase Timing:         Phase I Property – at Closing as defined below.
                         Phase II Property – within three (3) business days after completion of construction and rent commencement on the Phase II property.

Construction Lender:     a Solvenz / Tethys Partners LLC ("Lender")

Construction Loan:       Purchaser or their approved nominees or assignees will provide a construction loan (the "Construction Loan") for the Phase II Property which will be drawn upon during construction. Funding during the construction period will represent no more than 90% of the Purchase Price for the Phase II Property and require interest only payments at a rate of 4.86% per annum (under current market conditions). The obligations under the Construction Loan will be collateralized by the loan agreement, assignment of the Lease on the Phase II Property and pledge of revenues thereunder, a first-lien position on the

Phase II Property and assets, and reserves, if any.

**Guarantee:**    Developer shall serve as general contractor of the Phase II Property and will provide a recourse completion guarantee for the Phase II Property acceptable to Purchaser and Lender.

**Purchaser Contingencies:**    To be finalized in the Definitive Agreements but shall include, but not be limited to, the following for each of the Phase I and Phase II Properties, which shall be satisfied during the Due Diligence Period (as defined below):

A.    Appraisal (not less than Purchase Price), title, survey, utilities, zoning, soil and physical and environmental condition of the Properties acceptable to Purchaser and Lender in their sole discretion.

B.    A review of all leases, subleases and occupancy agreements affecting the Properties; said leases, subleases and occupancy agreements to be acceptable to Purchaser and Lender in their sole discretion.

C.    Guaranteed max price construction contract and performance guarantee thereon for the Phase II Property acceptable to the Purchaser and Lender.

D.    Property, casualty, rental replacement or business interruption, and other insurance for the Property acceptable to Purchaser and Lender in their sole discretion.

E.    Receipt by Purchaser and Lender of an estoppel certificate from the Tenant together with any and all sub-tenants, in the form required by Purchaser and Lender; receipt by Purchaser and Lender of an SNDA from the Tenant in a form acceptable to Purchaser and Lender, but such SNDA will be limited to the matters to be provided by the Tenant under the Leases.

F.    Receipt by Purchaser of a waiver of any right of first refusal that any party may have to purchase the Property.

G.    Purchaser shall have received engineering reports prepared by consultants approved by Purchaser indicating that the Property is structurally sound, suited to its intended use, and constructed according to plans provided to Purchaser.

H.    The Purchaser and Lender shall have received such environmental assessments of the Property, as deemed necessary by Purchaser and Lender, indicating that the Property is free and clear of all toxic waste and other hazardous materials, and is in compliance with all environmental laws.

I.    Receipt of a Certificate of Occupancy for the Phase I Property.

J.    Each of Phase I Property and Phase II Property is delivered on its own tax parcel.

K.   Review and approval by Purchaser and Lender of such other documents or aspects of the transaction, Properties, or the construction thereof, as Purchaser and Lender deem necessary in their sole and absolute discretion.

L.   Documentation that the Purchaser will receive a fee simple interest in the land and improvements upon purchase and that the Property is not subject to any encumbrance.

*Except for Contingency E, the Contingencies above shall be satisfied (or waived at Purchaser's sole option) thirty (30) days following the delivery of all requested due diligence materials (the "Due Diligence Period"). Contingency E shall be satisfied (or waived at Purchaser's sole option) prior to the Closing Date. In the event that any of the foregoing Contingencies is not acceptable, Purchaser shall have the right to terminate the Definitive Agreement or waive such Contingency and proceed to Closing. The documents described in Contingencies B, C, D, F, G, H, I, J, K and L are hereinafter referred to as the "Diligence Materials".*

| | |
|---|---|
| Closing: | Closing of the sale of the Phase I Property and closing of the Construction Loan for the Phase II Property (the "Closing") shall take place within 30 days after execution of the Definitive Agreement (anticipated to be not later than October 31, 2013) or such other date as is mutually agreeable to the parties. <u>The Purchaser will undertake its due diligence investigation simultaneous with the drafting of the Definitive Agreement and Transaction Documents.</u> |

Seller shall convey title to each Property by special warranty deed, bill of sale and assignment of leases, free and clear of all restrictions whatsoever, except for current real estate taxes not yet due or payable and the permitted exceptions (as agreed to in the Definitive Agreement). Purchaser acknowledges that an easement in favor of Developer will be granted over the Phase II Property to connect to land retained by the Tenant or its affiliates, and agrees that such easement shall be a permitted exception, as described further below.

The Seller shall pay at Closing the costs of the title commitment(s), the escrow fees and transfer tax(es).

The Closing of the Construction Loan for the Phase II property shall take place simultaneously with the closing of the Phase I property.

| | |
|---|---|
| Documentation: | The Definitive Agreement shall contain customary representations, covenants, conditions, indemnities and warranties and other matters as agreed to by the parties. Seller and Purchaser shall each bear its respective costs and expenses with respect to the negotiation, preparation and execution of the documents necessary to affect the purchase and sale agreements and Construction Loan for the Phase I and Phase II properties and no party shall have any liability to the other for such expenses. Seller shall pay all legal fees and related costs and expenses of the Lender relating to the Construction Loan for the Phase II property as incurred up to $175,000. Upon Closing, the Seller shall be reimbursed for the amount of such expenditures incurred up to $175,000. Seller shall |

wire 175,000 due immediately upon execution of this LOI. This LOI will be deemed null and void if these conditions are not met by August 22, 2013:

Solvenz, LLC
Wells Fargo Bank
ABA Routing# 121000248 (within the US) Acct # 2734807080

Easement
Agreement:        Purchaser shall enter into a Development Easement Agreement ("Easement Agreement") with Developer to enable Developer to attach a potential future Phase III development for the Tenant to the Phase II Property. Such Easement Agreement shall be conditioned on the Tenant or its affiliates occupying all three buildings. Should Tenant cease to occupy any one of the buildings, Purchaser at its election, may require Developer or the owner of the Phase III Property to remove and close the connection between the Phase III Property and the Phase II Property.

Phase III ROFO:   Developer shall grant Purchaser, or its affiliates or assignees, a Right of First Offer to purchase the potential future Phase III development for Tenant upon completion, as contemplated in the Easement.

Exclusivity:      Seller shall not initiate or conduct negotiations for the sale of the Property or provision of a Construction Loan with any party other than Purchaser and Lender unless Purchaser and Seller do not execute a Definitive Agreement on or before September 30, 2013, in which event either party may terminate negotiations upon notice to the other.

This letter of intent does not, and is not intended to, be legally binding on the parties (except for the provision entitled "Exclusivity" above). This letter of intent is only an expression of the basic conditions to be incorporated into the Definitive Agreement together with other terms to be agreed to between the parties. The parties shall not be contractually bound unless and until they enter into a Definitive Agreement, which must be in a form and content satisfactory to each party and to each party's legal counsel, in their sole discretion.

This Term Sheet expires August 21, 2013.

If the foregoing meets with your approval, please indicate so by acknowledging where provided for below and returning it to my attention.

Sincerely,

Equity Global Management, LLC

Shelby E. P. Pruett
Managing Principal and CEO
Equity Global Management, LLC


AGREED TO AND ACKNOWLEDGED
AS OF AUGUST 2, 2013:

Signed:

Name:

Title:

Company:


### SCHEDULE A

**Rent Schedule**

| Phase I | | | Phase II | | |
|---|---|---|---|---|---|
| Starting | Annual | Bumps | Starting | Annual | Bumps |
| 1/3/2013 | 2,994,827 | | | | |
| 1/3/2014 | 3,024,775 | 1.00% | 11/1/2014 | 2,455,000 | |
| 1/3/2015 | 3,104,023 | 2.62% | 1/1/2015 | 2,455,000 | 0.00% |
| 1/3/2016 | 3,135,063 | 1.00% | 1/1/2016 | 2,491,465 | 1.49% |
| 1/3/2017 | 3,166,414 | 1.00% | 1/1/2017 | 2,528,477 | 1.49% |
| 1/3/2018 | 3,198,078 | 1.00% | 1/1/2018 | 2,566,044 | 1.49% |
| 1/3/2019 | 3,230,059 | 1.00% | 1/1/2019 | 2,604,175 | 1.49% |
| 1/3/2020 | 3,262,359 | 1.00% | 1/1/2020 | 2,642,877 | 1.49% |
| 1/3/2021 | 3,294,983 | 1.00% | 1/1/2021 | 2,695,255 | 1.98% |
| 1/3/2022 | 3,227,933 | -2.03% | 1/1/2022 | 2,748,680 | 1.98% |
| 1/3/2023 | 3,261,212 | 1.03% | 1/1/2023 | 2,803,174 | 1.98% |
| 1/3/2024 | 3,294,824 | 1.03% | 1/1/2024 | 2,858,757 | 1.98% |
| 1/3/2025 | 3,328,772 | 1.03% | 1/1/2025 | 2,915,452 | 1.98% |
| 1/3/2026 | 3,363,060 | 1.03% | 1/1/2026 | 2,973,281 | 1.98% |

**From:** Richard McCrea <rmccrea@solvenz.com>
**To:** Robert N. Wilkinson <rnwlaw@aol.com>; Jasonewilk <jasonewilk@gmail.com>; jwilkinson <jwilkinson@andersoncall.com>
**Subject:** Fwd: Ryan lawsuit part three and final...
**Date:** Thu, Mar 20, 2014 6:26 pm
**Attachments:** Scan_118.pdf (11790K)

Begin forwarded message:

**From:** Jack Meyer <jack@meyerholdings.net>
**Date:** March 20, 2014 at 4:40:27 PM MDT
**To:** Richard McCrea <rmccrea@solvenz.com>
**Subject:** Ryan lawsuit part three and final...

J.E. (Jack) Meyer, Jr.
Meyer Holdings, LLC
2510 Via Torina
Del Mar, CA 92014
Direct 918.740.8331
jack@meyerholdings.net

# EXHIBIT B

# SOLVENZ

August 20, 2013

Daniel R. Levitt
Ryan Companies US, Inc.
50 South Tenth Street, Suite 300
Minneapolis, MN 55403

Re:   Letter of Intent by and between Ryan Companies US, Inc. and Equity Global
Management, LLC, affecting certain property in Johnston, Iowa (the "Letter of
Intent")

Dear Dan,

Please be advised that the undersigned, an authorized representative of Solvenz and Tethys
Partners, LLC (the "Lender"), is familiar with the contents of the attached Letter of Intent.
Lender covenants and agrees that it will work in good faith to negotiate such Definitive Agree-
ments (as defined in the Letter of Intent) as are reasonably required to document and secure the
construction loan together with the purchase of existing property Pioneer Hi-Bred International
Beaver Creek Campus and its existing lease with E.I. Dupont de Nemours and Company contem
plated by the Letter of Intent. Nothing in this letter obligates Lender to fund any loan until full
execution of the Definitive Agreements, which must be satisfactory to Lender, in Lender's sole
discretion.

Sincerely,

SOLVENZ, LLC

By: Richard McCrea
Its: Managing Director

TETHYS PARTNERS, LLC

By: _____
Its: _____

# EXHIBIT C

WWW.RYANCOMPANIES.COM

RYAN COMPANIES US, INC.
50 South Tenth Street, Suite 300
Minneapolis, MN 55403-2012

612-492-4000 tel
612-492-3000 fax



_VIA EMAIL_

August 15, 2013

Mr. Shelby E. L. Pruett
Managing Partner
EQUITY GLOBAL MANAGEMENT
200 West Madison Street, Suite 3250
Chicago, IL 60606

RE:    PIONEER HI-BRED INTERNATIONAL – BEAVER CREEK CAMPUS

Dear Shelby:

Equity Global Management ("EGM") has requested that Ryan Companies US, Inc. ("Ryan") furnish it with Ryan's 2013 audited financial statement ("Financial Report") in order to evaluate the Proposed Project. Ryan agrees to furnish the Financial Report to EGM, but only on the condition that EGM agrees to treat the Financial Report in strict confidence in accordance with the following terms and conditions:

1. The Financial Report will continue to be the property of Ryan. The Financial Report will be used by EGM *(AND EGM'S CAPITAL PARTNERS, SOLUENT AND TETRYS PARTNERS)* solely for the purpose of evaluating the Proposed Project, and upon request, will be returned to Ryan at the conclusion of the evaluation.

2. EGM agrees to keep the Financial Report strictly confidential and shall not disclose the contents thereof to any employee or person, other than you, without Ryan's prior written consent. *(PERMISSION HAS BEEN GRANTED TO DISCLOSE TO SOLUENS AND TETRYS PARTNERS)* The provisions of this Paragraph 2 shall not apply to information which (i) is or comes into the public domain, (ii) becomes subject to a properly issued subpoena, or (iii) becomes generally available to the public other than as a result of an unauthorized disclosure by EGM's representatives.

3. As used herein, the term "person" shall include, without limitation, any natural person, any corporation, limited liability company, partnership, limited partners, trust, pension fund, association, governmental entity or any other entity of any nature whatsoever.

4. This Agreement contains the entire agreement of the parties hereto with respect to the matters contemplated herein and supersedes any prior agreements or understandings with respect to the subject matter hereof. This Agreement may not be amended or terminated nor any of its provisions waived except by an instrument in writing signed by the party against whom such amendment, termination or waiver is sought to be enforced. This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns and shall be governed by and construed in accordance with the internal laws of the State of Minnesota, without regard to principles of conflict of laws.

Mr. Shelby E. L. Pruett
August 15, 2013
Page 2


Please indicate EGM's agreement with the terms of this Agreement by signing below and returning a copy to me at dan.levitt@ryancompanies.com following which I will send you the Financial Report.

Sincerely,

RYAN COMPANIES US, INC.

Daniel R. Levitt
Senior Vice President Capital Markets



Accepted and agreed this _____ day of August 2013

EQUITY GLOBAL MANAGEMENT

By: _____
Shelby E. L. Pruett, Chairman & CEO

# EXHIBIT D

WWW.RYANCOMPANIES.COM

RYAN COMPANIES US, INC.
50 South Tenth Street, Suite 300
Minneapolis, MN 55403-2012

612-492-4000 tel
612-492-3000 fax



BUILDING LASTING RELATIONSHIPS

November 12, 2013

Equity Global Management, LLC
200 West Madison Street, Suite 3250
Chicago, Illinois 60606
Attn: Shelby E.L. Pruett

Frost Brown Todd LLC
One Columbus, Suite 2300
10 West Broad Street
Columbus, Ohio 43215
Attn: Jason George

Tethys Partners, LLC
2900 Willowbridge Circle
Austin, Texas 78703
Attn: Jack Meyer

> Re:    Letter of Intent by and among Equity Global Management, LLC ("EGM"), Ryan
>        Companies US, Inc. ("Ryan"), and Ryan Fund IX, LLC ("Fund"), dated as of August 20,
>        2013 (the "LOI")

Gentlemen:

Please be advised that Ryan and Fund hereby terminate negotiations under the LOI.

Ryan and Fund request immediate return of the deposit paid at the execution of the LOI in the amount of $175,000.00. Please deliver a check in such amount, payable to Ryan, at the address above.

Thank you for your prompt attention to this matter. Should you have any questions regarding this notice, please contact me at 612-492-4319, or our counsel, Audra Williams, at 612-492-4423. Thanks again.

Sincerely,

Daniel R. Levitt
Senior Vice President
Ryan Companies US, Inc.

AZ LICENSE ROC196813 COMM, ROC212330 RES; CA LICENSE 012487; CHICAGO, IL LICENSE GC0463 (A) FL LICENSE CGC1519397, CGC1506553
EQUAL OPPORTUNITY EMPLOYER

# EXHIBIT E



200 West Madison Street, Suite 3250
Chicago, Illinois 60606
312-879-2270   fax: 312-879-2281

December 20, 2013

Mr. Timothy R. Velner
Ryan Companies US, Inc.
50 South Tenth Street, Suite 300
Minneapolis, MN 55403-2012

Dear Mr. Velner:

It is impossible for EGM to return the deposit. EGM does not have the funds. The $175,000 deposit was paid by Ryan Companies directly to the lender, Solvenz, LLC. At no time was any part of the deposit paid to EGM or any of its affiliates. EGM has received no fees or other consideration of any kind related to the transaction. EGM assigned the letter of intent to Tethys Partners, LLC simultaneously with the execution of the letter of intent, which was a condition of the lender's agreement to underwrite the transaction. Ryan negotiated directly with the lender and insisted on receipt of a comfort letter, signed by Solvenz and Tethys Partners, before wiring funds to Solvenz. I believe all of these facts are known to Ryan.

EGM has repeatedly requested that Solvenz return all or part of the deposit to Ryan. Solvenz has ignored these requests. I can understand why Ryan may want to pursue legal action against Solvenz; however, I do not understand why Ryan would bring a collection action against EGM. EGM does not believe it is legally responsible for the failure of Solvenz to return all or part of the deposit.

There should be no dispute between Ryan and EGM. Ryan's dispute is with Solvenz. EGM respectfully suggests that Ryan should direct its collection efforts against Solvenz.

EGM has forwarded Solvenz and Tethys Partners a copy of your email.

Best regards,

Shelby Pruett
Managing Principal